# EXHIBIT 17

## FORBEARANCE AGREEMENT
### (Recleim, LLC)

**THIS FORBEARANCE AGREEMENT** (hereinafter referred to as this "**Agreement**") is dated and made effective as of December 30, 2019 (hereinafter referred to as the "**Effective Date**"), by and among **RECLEIM, LLC** ("**Recleim**"), **RECLEIM NOVA, LLC** ("**Recleim Nova**"), **RECLEIM LOGISTICS, LLC** ("**Recleim Logistics**"), **RECLEIM OH, LLC** "(**Recleim OH**"), **RECLEIM PA, LLC** ("**Recleim PA**"), and **RECLEIM SC, LLC** ("**Recleim SC**"), each a Delaware limited liability company (each, a "**Borrower**" and collectively "**Borrowers**"), **JOHN STEPHEN BUSH**, a Georgia resident ("**Bush**"), **DWAYNE PETERSON DAVIS**, a Georgia resident ("**Davis**"), **PEACHTREE INVESTMENT SOLUTIONS, LLC**, a Georgia limited liability company (hereinafter referred to as "**Peachtree**"), and **FIFTH THIRD BANK, NATIONAL ASSOCIATION (formerly known as Fifth Third Bank),** a national banking association (hereinafter referred to as "**Lender**").

### RECITALS

### I.   THE REVOLVING LOAN AND THE TERM LOANS

A.    Recleim is indebted to Lender pursuant to a loan in the maximum principal amount $5,000,000 (hereinafter referred to as the "**Revolving Loan**").

B.    All Borrowers are indebted to Lender pursuant to several term loans, as follows: a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $2,308,331.76 (the "**May 3 Term Loan**");  a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $1,210,377.29 (the "**First December 19 Term Loan**"); a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $2,644,067.29 (the "**Second December 19 Term Loan**"); a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $6,347,824.00 (the "**Third December 19 Term Loan**"); a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $677,542.50 (the "**June 25 Term Loan**"); a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $128,661.65 (the "**First January 22 Term Loan**"); a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $340,738.00 (the "**Second January 22 Term Loan**"); a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $138,750.00 (the "**July 12 Term Loan**"); a term loan, as amended, modified, restated or supplemented, in the maximum principal amount of $96,000.00 (the "**August 28 Term Loan**") (collectively, the "**Term Loans**" and together with the Revolving Loan, the "**Loans**").

C.    The Revolving Loan was advanced pursuant to the terms and conditions of that certain Loan Agreement, dated December 20, 2018, by and between Recleim and Lender as amended and/or modified by that certain First Loan Modification Agreement dated April 29,

2019 (collectively, as amended, modified, restated or supplemented, the "**Revolving Loan Agreement**").

D.      The Term Loans were advanced pursuant to the terms and conditions of that certain Master Loan and Security Agreement, dated May 3, 2018, by and between all Borrowers and Lender as amended and/or modified by (i) that certain Amendment No. 001 to Master Loan and Security Agreement dated December 19, 2018 and (2) that certain letter agreement dated January 16, 2019 (collectively, as amended, modified, restated or supplemented, the "**Master Loan and Security Agreement**, together with the Revolving Loan Agreement, the "**Loan Agreements**").

E.      The Revolving Loan is evidence by that certain Revolving Note dated December 20, 2018 payable by Recleim to the order of Lender in the maximum principal amount of $5,000,000.00 (the "**Revolving Note**").

F.      The May 3 Term Loan is evidenced by that certain Promissory Note dated May 3, 2018 payable by Recleim and Recleim Nova to the order of Lender in the maximum principal amount of $2,308,331.76, as amended  by that certain Amendment No. 1 to Promissory Note Dated May 3, 2018, dated February 19, 2019 (the "**May 3 Note**"). The First December 19 Term Loan is evidenced by that certain Promissory Note dated December 19, 2018 payable by Recleim and Recleim OH to the order of Lender in the maximum principal amount of $1,210,377.29 (the "**First December 19 Note**"). The Second December 19 Term Loan is evidenced by that certain Promissory Note dated December 19, 2018 payable by Recleim and Recleim PA to the order of Lender in the maximum principal amount of $2,644,067.29 (the "**Second December 19 Note**"). The Third December 19 Term Loan is evidenced by that certain Promissory Note dated December 19, 2018 payable by Recleim and Recleim SC to the order of Lender in the maximum principal amount of $6,347,824.00 (the "**Third December 19 Note**"). The June 25 Term Loan is evidenced by that certain Promissory Note dated June 25, 2018 payable by Recleim and Recleim Logistics to the order of Lender in the maximum principal amount of $677,542.50, as amended by (i) that certain Amendment No. 1 to Promissory Note Dated June 25, 2018, dated September 10, 2018 and (ii) Amendment No. 2 to Promissory Note Dated June 25, 2018, dated February 19, 2019 (the "**June 25 Note**"). The First January 22 Term Loan is evidenced by that certain Promissory Note dated January 22, 2019 payable by Recleim and Recleim Nova to the order of Lender in the maximum principal amount of $340,738.00 (the "**First January 22 Note**"). The Second January 22 Term Loan is evidenced by that certain Promissory Note dated January 22, 2019 payable by Recleim and Recleim Logistics to the order of Lender in the maximum principal amount of $128,661.65 (the "**Second January 22 Note**"). The July 12 Term Loan is evidenced by that certain Promissory Note dated July 12, 2019 payable by Recleim, Recleim Nova, and Recleim Logistics to the order of Lender in the maximum principal amount of $138,750.00 (the "**July 12 Note**"). The August 28 Term Loan is evidenced by that certain Promissory Note dated August 28, 2019 payable by Recleim, Recleim Nova, and Recleim Logistics to the order of Lender in the maximum principal amount of $96,000.00 (the "**August 28 Note**") (collectively, the "**Term Notes**" together with Revolving Note, the "**Notes**").

G.      The Revolving Note is secured by that certain Security Agreement dated December 20, 2018 (with any and all amendments or modifications, hereinafter referred to as the "**Revolving Security Agreement**") which grants Lender a first position security interest and lien

42421661 v8

in and to all of Recleim's accounts, inventory, equipment, general intangibles, investment property, instruments, chattel paper, electronic chattel paper, documents, securities, moneys, cash, letters of credit, letter of credit rights, promissory notes, warrants, dividends, distributions, contracts, agreements, contract rights, all assets and personal property, fixtures, goods, farm products, supporting obligations, software, commercial tort claims, minerals, standing timber, and growing crops  together with all proceeds and product thereof (as more particularly described in the Security Agreement, the "**December Personal Property Collateral**").

H.    The Term Notes are secured by the Master Loan and Security Agreement dated May 3, 2018 (the "**Master Security Agreement**" together with Revolving Security Agreement, the "**Security Agreements**") which grants Lender a first position security interest and lien in and to all of Borrowers' equipment (including without limitation, all inventory, equipment, fixtures, or other property comprising the same), and general intangibles relating thereto; any and all Rate Management Obligations; all subleases, chattel paper, accounts, security deposits and bills of sale relating thereto; any and all substitutions, replacements or exchanges for any such Equipment or other collateral; and any other property or assets in which Borrower may have in the past or shall have in the future granted a security interest  (as more particularly described in the Master Loan and Security Agreement, the "**May Personal Property Collateral**" and together with the December Personal Property Collateral, the "**Collateral**").

I.    In connection with the Loans and as an inducement therefor, Peachtree, Bush, and Davis each executed and delivered to Lender those certain Continuing Guaranty Agreement dated May 3, 2018, pursuant to which Peachtree, Bush, and Davis each unconditionally guaranteed the punctual performance of all of the obligations owed to Lender by Recleim, Recleim Nova, and Recleim Logistics, including without limitation, the Notes (each a "**Guaranty**" and collectively referred to as the "**Master Guarantees**"). Additionally, Recleim SC, Recleim OH, and Recleim PA each executed and delivered to Lender those certain Continuing Guaranty Agreements each dated December 20, 2018 (each a "**Guaranty**" and collectively, the "**Revolving Guarantees**") pursuant to which Recleim SC, Recleim OH, and Recleim PA each unconditionally guaranteed the punctual performance of all of Recleim's obligations to Lender, including without limitation, the Notes. Peachtree, Bush, Davis, Recleim SC, Recleim OH, and Recleim PA are each individually a "**Guarantor**" and collectively referred to as the "**Guarantors**".  The Master Guarantees and the Revolving Guarantees are referred to collectively as the "**Guarantees**".

J.    The Loans, Loan Agreements, Notes, Security Agreements, Guaranty Agreements, DACAs, and any and all other related documents, as amended, revised, modified or substituted are hereinafter collectively referred to as the "**Loan Documents**".

## II.    THE EXISTING EVENTS OF DEFAULT

A.    Lender has previously notified Borrowers and Guarantors (each an "**Obligor**" and collectively referred to herein as the   "**Obligors**") that an Event of Default has occurred and exists under the Loan Documents, due to, *inter alia*, the Obligors' failure to perform all of its obligations owed to Lender under the Loan Documents, including, *without limitation*, (i) as of March 31, 2019, June 30, 2019, and September 30, 2019, the failure to maintain a Fixed Charge Coverage Ratio of not less than 1.25 to 1 as described in Section 5.8 of the Loan Agreement; (ii)



as of March 31, 2019, June 30, 2019, and September 30, 2019, the failure to maintain the Senior Funded Indebtedness to EBITDA Ratio equal to or less than 3.25 to 1.0, measured quarterly as described in Section 5.9 of the Loan Agreement; (iii) as of December 31, 2018, the failure to provide an unqualified audited financial statement as required under Section 10(a)(iv) of the Master Loan and Security Agreement; (iv) as of December 31, 2018, the failure to maintain a Fixed Charge Coverage Ratio of not less than 1.25 to 1.0 as described in Section 10(e) of the Master Loan and Security Agreement; and (v) as of December 31, 2018, the failure to maintain a Funded Indebtedness to EBITDA Ratio of not less than 2.75 to 1.0 as described in Section 10(f) of the Master Loan and Security Agreement (hereinafter collectively referred to as the "**Existing Events of Default**"). As a result of the Existing Events of Default, Lender has no obligation to make loans or otherwise extend credit to Borrowers under the Loan Documents.

B.     Lender has the immediate right to exercise its various rights and remedies under the Loan Documents by virtue of the Existing Events of Default. All necessary notices have been given by Lender to the Obligors as to the Existing Events of Default, and all applicable cure periods have expired. By virtue of such notices, Lender's right to statutory attorneys' fees under O.C.G.A. § 13-1-11 has been perfected and the entire amount of principal, interest, statutory attorneys' fees and other charges under the Loan Documents is fully accelerated and immediately due and payable in full.

## THE FORBEARANCE REQUEST

A.     The Obligors have informed Lender that they do not currently have sufficient resources to pay the Loans in full and have requested that Lender forbear from the enforcement of Lender's rights and remedies against the Obligors and the Collateral.

B.     Lender is willing to grant the requested forbearance, but only upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for and in consideration of the foregoing Recitals, the covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, the Obligors agree with Lender, and represent and warrant to Lender, and Lender agrees with the Obligors, as follows:

1.     <u>Capitalized Terms</u>.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Documents.

2.     <u>Confirmation of Recitals and Other Matters</u>.  As a material inducement for Lender to enter into this Agreement, the Obligors agree with Lender, as follows:

(a)     As of the Effective Date, the Recitals to this Agreement are true and correct.

(b)     As of November 26, 2019, the total amount due and owing under the Revolving Note, exclusive of legal fees, is principal in the amount of $4,990,224.15 plus accrued and outstanding interest in the amount of $16,582.10, for a total amount of $5,006,806.25. Interest and other charges shall continue to accrue on the Revolving Note as set forth in the Loan Documents.

Forbearance Agreement - Page 4

(c)    As of November 26, 2019, the total amount due and owing under the May 3 Note, exclusive of legal fees, is principal in the amount of $1,536,216.67 plus accrued and outstanding interest in the amount of $8,834.44, for a total amount of $1,545,048.11. Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

(d)    As of November 26, 2019, the total amount due and owing under the First December 19 Note, exclusive of legal fees, is principal in the amount of $1,109,512.49 plus accrued and outstanding interest in the amount of $6,968.55, for a total amount of $1,116,481.04.  Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

(e)    As of November 26, 2019, the total amount due and owing under the Second December 19 Note, exclusive of legal fees, is principal in the amount of $2,424,728.39 plus accrued and outstanding interest in the amount of $15,222.77, for a total amount of $2,438,951.16.  Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

(f)    As of November 26, 2019, the total amount due and owing under the Third December 19 Note, exclusive of legal fees, is principal in the amount of $5,818,838.70 plus accrued and outstanding interest in the amount of $36,546.54, for a total amount of $5,855,385.24.  Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

(g)    As of November 26, 2019, the total amount due and owing under the June 25 Note, exclusive of legal fees, is principal in the amount of $482,480.13 plus accrued and outstanding interest in the amount of $2,799.72, for a total amount of $485,279.85. Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

(h)    As of November 26, 2019, the total amount due and owing under the First January 22 Note, exclusive of legal fees, is principal in the amount of $107,079.53 plus accrued and outstanding interest in the amount of $618.64, for a total amount of $107,698.17.  Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

(i)    As of November 26, 2019, the total amount due and owing under the Second January 22 Note, exclusive of legal fees, is principal in the amount of $283,581.60 plus accrued and outstanding interest in the amount of $1,638.36, for a total amount of $285,219.96.  Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

(j)    As of November 26, 2019, the total amount due and owing under the July 12 Note, exclusive of legal fees, is principal in the amount of $132,605.19 plus accrued and outstanding interest in the amount of $662.63, for a total amount of $133,267.82. Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

Forbearance Agreement - Page 5



(k)    As of November 26, 2019, the total amount due and owing under the August 28 Note, exclusive of legal fees, is principal in the amount of $94,825.28 plus accrued and outstanding interest in the amount of $446.45, for a total amount of $95,271.73.  Interest and other charges shall continue to accrue on the Term Notes as set forth in the Loan Documents.

(l)    As of November 25, 2019, Lender's accrued and unpaid legal fees and expenses that have been actually incurred as of the Effective Date in this matter are $31,141.90 (hereinafter referred to as the "**Attorneys' Fees**").

(m)    As of December 16, 2019, Borrowers owe fees in the amount of $3,189.32 for an inventory assessment conducted by Sector 3 (the "**Inventory Assessment Fee**").

(n)    The Existing Events of Default have occurred and are continuing under the Loan Documents and all applicable cure periods have expired with respect thereto, and the Obligors have received or waived any notices to which they may be entitled with respect thereto. Lender has given notice of, and is entitled to, statutory attorney fees under O.C.G.A. § 13-1-11.

(o)    Subject to the agreements of Lender as set forth herein, the Loans and the Attorneys' Fees are due and payable in full without offset, defense, or reduction, and Lender is free to exercise any and all of its rights and remedies under the Loan Documents in accordance with the terms thereof.

(p)    Notwithstanding the execution of this Agreement and the consummation of the transactions described herein, interest shall continue to accrue at the rate or rates stated in the Loan Documents, as modified by this Agreement, together with all charges allowed thereunder (including the attorneys' fees and other collection costs incurred by the Lender), the payment or reimbursement of which are obligations of the Obligors as provided for therein.

(q)    Lender has fully and timely performed all of its obligations and duties in compliance with the Loan Documents and applicable law, and has acted reasonably, in good faith and appropriately under the circumstances.

3.    <u>Amendment to Loan Agreements.</u>    The Obligors and Lender hereby agree that the Loan Agreements are modified in all respects to give effect to a new maturity date. Therefore, as of the effective date, the Maturity Date provided in the Loan Agreements is hereby modified in all respects to March 31, 2020.

4.    <u>Forbearance by Lender.</u>    Notwithstanding the Existing Events of Default but subject to the other terms and conditions set forth in this Agreement, commencing on the Effective Date and continuing until the occurrence of the Forbearance Termination Date (as defined in <u>Section 8</u> below)(hereinafter referred to as the "**Forbearance Period**"), Lender agrees that it shall not (a) take any action to repossess, foreclose upon, sell, or control any of the Collateral, or (b) take any actions or file any proceedings, whether under the Loan Documents, at law or in equity, to enforce any of Lender's rights and remedies with respect to the foregoing Loan Documents or against the Collateral (the foregoing covenant being hereinafter referred to

as the "**Forbearance Covenant**").    Immediately upon the occurrence of the Forbearance Termination Date, Lender shall have the right, at any time, and from time to time, to exercise any and all rights and remedies available against the Obligors, the Collateral, or both of the foregoing, under the Loan Documents, this Agreement, at law or in equity, to the same extent that Lender would be entitled if the Forbearance Covenant had never been part of this Agreement.

5.    Conditions to Forbearance Covenant.    Notwithstanding the foregoing, the Forbearance Covenant is, subject however, to compliance by the Obligors in all respects with the following terms and conditions:

a.    On or before the Effective Date, the Obligors shall make (i) a cash payment to Lender in the amount of $31,141.90 for Attorneys' Fees incurred by Lender through November 25, 2019, and (ii) a cash payment to Lender in the amount of $3,189.32 for Inventory Assessment Fee.

b.    On or before the Effective Date, the Obligors shall make a forbearance fee payment in the amount of $25,000 to Lender (the "**Initial Forbearance Fee**").    The Initial Forbearance Fee shall be deemed fully earned upon execution of this Agreement. The Initial Forbearance Fee shall partially compensate Lender for the costs of origination, structuring, processing, approving and closing the transactions contemplated by this Agreement, including, but not limited to, administrative, general overhead and lost opportunity costs, but not including any out-of-pocket or other expenses for which Obligors have agreed to reimburse Lender pursuant to any other provisions of this Agreement or any of the other Loan Documents.

c.    On or before January 31, 2020, the Obligors shall make a forbearance fee payment in the amount of $10,000 to Lender (the "**Second Forbearance Fee**") if the other January 31, 2020, Obligations are not fulfilled or otherwise in compliance. Collectively, January 31, 2020, Obligations shall mean, as defined herein, the Principal Paydown, OZ List, Equipment LOI, LL Subordinations, Appraisal, Executed DACAs and Titles.    The Second Forbearance Fee shall be deemed fully earned upon execution of this Agreement.    The Second Forbearance Fee shall partially compensate Lender for the costs of origination, structuring, processing, approving and closing the transactions contemplated by this Agreement, including, but not limited to, administrative, general overhead and lost opportunity costs, but not including any out-of-pocket or other expenses for which Obligors have agreed to reimburse Lender pursuant to any other provisions of this Agreement or any of the other Loan Documents.    In the event all January 31, 2020, Obligations are fulfilled or otherwise in compliance then the Second Forbearance Fee is waived.

d.    On or before January 31, 2020, the Obligors shall remit a $2,000,000 principal payment to be applied to principal amounts outstanding under the Notes as directed by Recleim (the "**Principal Paydown**").

e.    During the Forbearance Period, the Obligors shall remit the following payments to Lender:

42421661 v8



**Revolving Note**

    i.   On January 1, 2020, and on the first (1st) day of each successive calendar month thereafter during the Forbearance Period, the Obligors shall remit to Lender a monthly installment of accrued and unpaid interest due under the Revolving Note.

   ii.   On or before the Forbearance Termination Date, the Obligors shall remit to Lender the entire principal amount outstanding under the Revolving Note, together with any and all accrued but unpaid interest thereon, plus any and all outstanding charges due under the Loan Documents, including without limitation, the actual, reasonable attorneys' fees and Second Forbearance Fee.

**Term Notes**

   iii.   On December 20, 2019, and on the twentieth (20th) day of each successive calendar month thereafter during the Forbearance Period, the Obligors shall remit to Lender a monthly installment of accrued and unpaid interest due under the Term Notes.

   iv.   On or before the Forbearance Termination Date, the Obligors shall remit to Lender the entire principal amount outstanding under the Term Notes, together with any and all accrued but unpaid interest thereon, plus any and all outstanding charges due under the Loan Documents, including without limitation, the actual, reasonable attorneys' fees and Second Forbearance Fee.

     f.    During the Forbearance Period, the interest rate payable by the Borrowers under the Revolving Note and the Term Notes shall continue to accrue at the interest rate set forth in each of the Notes.

     g.    At all times during the Forbearance Period, the Borrowers shall work diligently towards a refinancing, sale, or other strategic transaction, from which the cash proceeds at the closing thereof shall be used to pay off the Obligations then due in full. The Borrowers are seeking to raise funding through a sale of equity, including, but not limited to, through opportunities (the "**Opportunity Zone Equity Raise**") which meets the provisions described in Sections 1400Z-1 and 1400Z-2 (the "**Opportunity Zone Provisions**") of the Internal Revenue Code of 1986, as amended from time to time. The Opportunity Zone Provisions relate to a federal income tax program which is designed to encourage private capital investment in certain designated areas (the "**Opportunity Zone Program**").

    i.   On or before the Effective Date, Borrowers shall provide Lender copies of the final offering documents issued in support of their Opportunity Zone Equity Raise.

Forbearance Agreement - Page 8

  ii. On or before January 31, 2020, Borrowers shall provide Lender a list of all parties who have committed to invest in their Opportunity Zone Equity Raise and copies of all reasonable documentation in support of the same (the "**OZ List**"); provided, however, that the Borrowers may redact personal financial and other information including, but not limited to, social security numbers, birthdates, and financial statements from the information provided to the Lender.

  iii. On or before March 31, 2020, the Opportunity Zone Equity Raise or other equity raise shall close and all investments related thereto shall be received by Borrowers.

  h. On or before January 31, 2020, the Obligors shall have delivered to Lender letters of intent for refinancing the Term Notes (the "**Equipment LOI**").

  i. On or before January 31, 2020, the Obligors shall have delivered to Lender landlord subordinations for the four following properties leased by Borrowers in form reasonably acceptable to Lender (collectively, the "**LL Subordinations**").

  i. 118 Hard Street, Graniteville, SC 29829

  ii. 164 Bettis Academy Road, Graniteville, SC 29829

  iii. 1601 E. 4th Street, Lima, OH 45804

  iv. 4301 N Delaware Ave, Philadelphia, PA 19137

  j. The Obligors shall use their reasonable best efforts to deliver to Lender landlord subordinations for all of the remaining properties leased by Borrowers by January 31, 2020, in a form reasonably acceptable to Lender.

  k. On or before January 31, 2020, the Obligors shall have delivered appraisals on all machinery and equipment serving as Collateral to Lender (the "**Appraisal**").

  l. On or before the Effective Date, the Obligors shall have caused Deposit Account Control Agreements, in the same form as those attached hereto as Exhibit "A", to be delivered to (1) Cadence Bank, N.A. for: Recleim account ending #4266, Recleim Logistics account ending #6529, Recleim Nova account ending #2577, Recleim OH account ending #8320, Recleim PA account ending #4378, Recleim SC account ending #4696, and (2) SunTrust Bank for: Recleim account ending in #2103, Recleim account ending in #9837, Recleim account ending in #0388, Recleim account ending in #3924 (collectively, the "**DACAs**").

  m. On or before January 31, 2020, the Obligors shall deliver to Lender fully executed originals of the DACAs (the "**Executed DACAs**").

42421661 v8

n.      On or before January 31, 2020, Obligors shall deliver all titles, to the extent they exist, to the rolling stock and vehicles listed on Exhibit "B" with Recleim listed as owner and Lender listed as lienholder for each title (the "**Titles**").

o.      From and after the Effective Date, the Obligors shall be and remain current on all insurance policies required to be maintained under the Loan Documents.

p.      From and after the Effective Date, the Obligors shall submit to Lender at such frequency as deemed necessary by Lender in the exercise of its sole discretion, such financial statements, documents, certificates, reports, or additional information that Lender may reasonably request from time to time, including *without limitation*, the timely delivery of the financial statements and reports set forth in Section 6 of this Agreement.

q.      From and after the Effective Date, the Obligors shall use their best efforts to obtain alternative financing and consummate such transaction so that the Loan Documents are paid in full by the Forbearance Termination Date.  Borrowers agree to deliver to Lender any commitment letters from any financial institution to provide financing to Borrowers to pay off the Loan Documents within five (5) days of receipt of the same.

r.      If deemed necessary by the Lender in the exercise of its sole discretion, and upon reasonable notice to the Obligors, the Lender may conduct a field exam of the Collateral to inspect, examine and verify the Accounts, Inventory and other Collateral, make copies of and make abstracts from all the records and books of account of, and visit the properties of, Obligors, and to discuss the affairs, finances, and Collateral generally of Borrowers with any of its respective owners, officers, directors, shareholders, members, or partners and Obligors' independent accountants and consultants (collectively, the "**Field Exam**").  Lender will submit an invoice for the Field Exam upon completion and Obligors will reimburse Lender for the costs of the Field Exam within fifteen (15) days after the invoice is presented.

6.      Reporting Requirements.  Commencing on the Effective Date, the Obligors shall timely deliver the following reports and other financial information required under the Loan Documents.

a.      Form 941.  Within fifteen (15) calendar days of receiving such form from its third party processor, Borrowers shall deliver to Lender proof that IRS Form 941, Employer's Quarterly Federal Tax Form, is current and has been timely submitted to the Internal Revenue Service as and when due.  Such statements shall be certified as to their correctness by the principal financial officer of the Borrowers.

b.      State and Federal Tax Returns.  Within thirty (30) calendar days of filing with the Internal Revenue Service and any state revenue commissioner, the Borrowers shall deliver to Lender a true and correct copy of its filed state and federal tax returns, together with any and all amendments, and any filed extensions.

c.      Monthly Financial Statements.  Within fifteen (15) calendar days after the last day of each calendar month, each Borrower shall deliver to Lender bank statements on

Forbearance Agreement - Page 10



all accounts.  Beginning with November 2019, within thirty (30) calendar days after the last day of each calendar month, each Borrower shall deliver to Lender unaudited internally prepared consolidated monthly financial statements, in accordance with the agreed forms attached hereto as <u>Exhibit "C"</u>,  which statements shall include without limitation, balance sheets, statements of income, interest expense to date, cash flows, and retained earnings, together with supporting schedules, and a year to date compilation, all in reasonable detail and prepared in conformity with generally accepted accounting principles, applied on a basis consistent with that of the preceding year, in form and substance satisfactory to Lender.  Beginning with November 2019, within thirty (30) calendar days after the last day of each calendar month, each Borrower shall also deliver to Lender a detailed accounts receivables aging and a detailed accounts payable aging.

d.  <u>Fiscal Year End Statements.</u>  No later than February 14, 2020, each Borrower shall deliver to Lender its 2018 financial year end compiled statements, including (a) a sheet for each Borrower as of the end of such fiscal year, together with all supporting schedules; and (b) the opinion of an independent certified public accountant acceptable to Lender stating that such materials were (i) prepared in accordance with generally accepted accounting principles, (ii) fairly present each Borrower's financial condition, (iii) show all material liabilities, direct and contingent, (iv) fairly present the results of each Borrower's operations, and (v) disclose the existence of any hedge and/or off-balance sheet transactions.

e.  <u>Other Reports.</u>  From and after the Effective Date, each Obligor shall submit to Lender at such frequency as deemed necessary by Lender in the exercise of its sole discretion, such financial statements, documents, certificates, reports, or additional information that Lender may reasonably request from time to time; provided, however, that Lender shall provide reasonable notice to Borrowers of any additional reporting it requests and a reasonable opportunity for Borrowers to provide such information.

f.  <u>Waiver of Certain Reporting Requirements.</u>  Lender waives any default resulting from the failure to produce the following reports as of the Effective Date.
  i.  Lender waives any defaults of the Borrowing Base Certificate set forth in the Revolving Loan Agreement §5.7(d) and in the Master Loan and Security Agreement §10(a)(i) from August 2019.
  ii.  Lender waives any defaults of the Compliance Certificate set forth in the Revolving Loan Agreement §5.7(c) and in the Master Loan and Security Agreement §10(a)(ii) from June 2019.
  iii.  Lender waives any defaults of the Inventory Report set forth in the Master Loan and Security Agreement §10(a)(i) from August 2019.

7.  <u>Application of Payments.</u>  From and after the Effective Date, the Obligors hereby acknowledge and agree that Lender is authorized and permitted to apply any and all amounts paid to and received by Lender under this Agreement to the principal, interest, late charges, and costs of collection, including actual, reasonable attorneys' fees, due and owing under the Loan

Documents, in such manner, order, and extent as Lender determines in the exercise of its sole discretion.

8.    <u>Termination of Forbearance</u>.

(a)    As used in this Agreement, the "**Forbearance Termination Date**" shall be the earlier of (i) the Stated Expiration Date or (ii) the date on which a Forbearance Termination Event (as hereinafter defined) occurs. As used herein, the "**Stated Expiration Date**" shall mean March 31, 2020.

(b)    As used herein, "**Forbearance Termination Event**" means the occurrence of one or more of the following events:

(i)    The occurrence of an Event of Default or other default (other than the Existing Events of Default) pursuant to any of the Loan Documents, as modified herein; provided, however, that with respect to the requirements of Sections 5(n), 5(o), 5(r), 6(a), 6(b), 6(c), 6(d) and 6(e) in this Agreement, Lender shall provide Borrowers with notice of any default existing thereunder and Borrower shall have ten (10) days to cure any such default before becoming an Event of Default herein.

(ii)    The occurrence of any material diminution or decline in the value of the Collateral during the Forbearance Period provided, however, that Lender shall provide Borrowers with notice of any default existing thereunder and Borrowers shall have ten (10) days to cure any such default before becoming an Event of Default herein.

(iii)    The voluntary or involuntary sale, conveyance, or transfer of the Collateral (other than dispositions of Inventory in the ordinary course of business), or any part or portion thereof, during the Forbearance Period without the prior written approval and consent of Lender.

(iv)    Any case or other proceeding is instituted by or against any of the Obligors under any state or federal law relating to the bankruptcy or insolvency of debtors, including, without limitation, the United States Bankruptcy Code, 11 U.S.C. § 101, <u>et seq</u>., and continues undismissed or unstayed for 60 calendar days.

(v)    Any of the acknowledgments, warranties, or representations of the Obligors set forth in this Agreement shall be untrue or inaccurate in any material respect when made or deemed made.

(vi)    Any Obligor has breached, defaulted, or failed to perform or observe any of its obligations, agreements, conditions or undertakings contained in this Agreement.

9.    <u>No Further Forbearance</u>.  The Obligors acknowledge that Lender has informed them that Lender has not approved an extension or renewal of the Forbearance Covenant beyond Forbearance Termination Date, and the Obligors have agreed that they are exploring alternative

means of financing and that they will in any event repay all indebtedness due to Lender in full on or before Forbearance Termination Date.

10.    Reaffirmation of Obligations. Notwithstanding anything to the contrary in this Agreement, no action of Lender under this Agreement or otherwise shall act to release the Obligors from their obligations to Lender with respect to the Loan Documents (hereinafter collectively referred to as the "**Obligations**"), and all of said Obligations are hereby ratified and affirmed the same as if repeated on this date, and the Obligors acknowledge that they have no legal or equitable defenses or offsets with respect to the Obligations.  The Obligors ratify and confirm all terms and conditions of the Loan Documents and acknowledge that the same are in full force and effect and constitute the legal, valid and binding obligations of Obligors enforceable against them in accordance with its respective terms.

11.    No Right to Reborrow; Cessation of Advances.  The Obligors shall have no right to receive new advances under the Loan Documents, or to reborrow any amounts that are repaid and applied to the outstanding balance of the Loan Documents; provided that, Lender has the sole and absolute discretion to permit advances under the Loan Documents for the purpose of (a) protecting and preserving the Collateral and (b) satisfying any and all payment obligations of the Obligors to Lender under this Agreement.

12.    Expenses.  The Obligors agree to pay or reimburse **ON DEMAND** all costs and expenses incurred by Lender in connection with the Existing Events of Default, including the statutory attorneys' fees under O.C.G.A. §13-1-11, as well as all expenses incurred by Lender in connection with the preparation, negotiation, execution, and delivery of this Agreement, and the consummation of the transactions contemplated herein. On or before the Forbearance Termination Date, the Obligors shall remit to Lender the entire amount of the obligations due under the Loan Documents as affected by this Agreement, less the statutory attorneys' fees but including any unreimbursed actual attorneys' fees incurred by Lender in connection with the enforcement of the Loan Documents and the preparation, negotiation and administration of this Agreement (the "**Payoff**").  If the Payoff is made before the Forbearance Termination Date, Lender shall accept same in satisfaction of the obligations under the Loan Documents.  In the event the Payoff is not paid to Lender prior to the occurrence of the Forbearance Termination Date, the Payoff becomes irrelevant and the entire outstanding amount due and owing under the Loan Documents, including all statutory attorneys' fees, shall have remained immediately due and payable and shall no longer be subject to the Forbearance Covenant.

13.    Consent of Guarantors.  The Guarantors hereby consent and agree to the provision of this Agreement and agree that the guarantees of payment and performance heretofore executed by them shall each continue in full force as provided therein. The Guarantors, by executing this Agreement, hereby assent to the terms and conditions of this Forbearance Agreement and ratify and reaffirm the terms and conditions of the Guarantees, which Guarantees shall remain in full force and effect.   The Guarantors hereby waive any defense to their obligations under the Guarantees under any theory whatsoever only as result of the defaults alleged in the notice of default.  Notwithstanding any language contained in the Guarantees, the Guarantors, to the extent permitted by law, waive any claim or other right which the Guarantors might now have or hereafter may acquire against the Borrowers, which arises from the existence or performance of Guarantors' liability or other obligations under the Guarantees which the

Forbearance Agreement - Page 13

Guarantors have executed in favor of the Lender, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, and any right to participate in any claim or remedy of the Lender against the Borrowers or any of the Collateral, whether or not such claim, remedy, or right arises in equity, or under contract, statute, or common law.

14.    <u>Further Assurances</u>.  The Obligors shall, upon Lender's reasonable request, (a) promptly correct any defect, error or omission in any Loan Documents or this Agreement; (b) execute, acknowledge, deliver, procure, record or file such further instruments and do such further acts as Lender deems necessary, desirable or proper to carry out the purposes of the Loan Documents and this Agreement and to identify and subject to the liens and security interest of the Loan Documents and this Agreement any property intended to be covered thereby, including any renewals, additions, substitutions, replacements, or appurtenances to the Collateral; (c) execute, acknowledge, deliver, procure, file or record any document or instrument Lender deems necessary, desirable, or proper to protect the liens or the security interest under the Loan Documents and this Agreement against the rights or interests of third persons; and (d) provide such certificates, documents, reports, information, affidavits and other instruments and do such further acts deemed necessary, desirable or proper by Lender to comply with the requirements of any agency having jurisdiction over Lender.

15.    **<u>Waiver of Certain Notices</u>.  To the maximum extent permitted by applicable law, the Obligors waive any and all rights to notice they might have been entitled to receive in the past in connection with the possession, sale, liquidation, collection, or disposition of the Collateral, or any interest therein or part hereof, including without limitation, the waiver of any right to (i) receive notification of disposition under either O.C.G.A. § 11-9-611, (ii) to require the mandatory disposition of collateral under either O.C.G.A. § 11-9-620, and (iii) to redeem collateral under either O.C.G.A. § 11-9-623.**

16.    <u>No Waiver of Lender's Rights and Remedies</u>.  Subject to the terms hereof, this Agreement shall not be construed or deemed as a limitation or release of Lender's available rights and remedies under the Loan Documents, at law or in equity, in connection with any default or event of default, including the Existing Events of Default, whether now existing or hereafter occurring.

17.    **<u>Release</u>.  In consideration of Lender entering into this Agreement, and without any contingency, precondition, or condition subsequent, each Obligor, for itself and its successors and assigns, does hereby jointly and severally fully and forever release, relinquish, discharge, settle and compromise any and all claims, cross-claims, counterclaims, causes, damages and actions of every kind and character, and all suits, costs, damages, expenses, compensation and liabilities of every kind, character and description, whether direct or indirect, known or unknown, in law or in equity, which they have or will have against Lender, its subsidiaries, affiliates, officers, directors, shareholders, agents, attorneys, professionals, representatives, contractors, predecessors, successors and assigns (each, in such capacity only), both present and former, on account of, arising, or resulting from, or in any manner incidental to, any and every thing or event occurring or failing to occur at any time in the past up to and including the date hereof, including, without limitation, any claims relating to the Loans, the Loan Documents, the**

Collateral, the Existing Events of Default, this Agreement, any act and event relating to Lender's administration of the Loans, or any other transaction contemplated by this Agreement (hereinafter referred to as the "Released Claims").

18.     Indemnification.     The Obligors shall indemnify and hold Lender and its shareholders, directors, agents, officers, affiliates, and subsidiaries (each, in such capacity only) harmless from and against all losses, liabilities, claims, damages or expenses relating in any way to this Agreement, the Loans, the Loan Documents, the Collateral, the Existing Events of Default, and the transactions contemplated by this Agreement, unless directly caused by the gross negligence or willful misconduct of such indemnified person.  The indemnity will continue to apply, however, to all other indemnified persons.

19.     Covenant Not to Sue.  The Obligors covenant not to sue Lender or any other person or entity for any Released Claims, including without limitation, any Released Claims with respect to the Loans, the Loan Documents, the Collateral, the Existing Events of Default, this Agreement, any act and event relating to Lender's administration of the Loans, or the facts and transactions alleged in the Recitals that Obligors have or may have had as of the Effective Date.

20.     Survival. The Obligors acknowledge and agree that the foregoing release, indemnification, and covenant not to sue provisions shall survive the expiration or termination of this Agreement.

21.     Representations and Warranties.  In addition to all other representations and warranties set forth herein, the Obligors represent, warrant, and covenant to and with Lender, which representations, warranties and covenants shall survive until the Obligations are indefeasibly satisfied in full, that:

(a)     Each Borrower is duly incorporated, validly existing, and in good standing under the laws of the state of its incorporation, has the corporate power to carry on its business as now being conducted, and is duly qualified to do business and is in good standing in every jurisdiction in which the transaction of its business makes its qualification necessary.

(b)     Each Obligor has the full power, authority, and capacity to enter into this Agreement and to incur the obligations and consummate the transactions described herein and therein, all of which have been authorized by all proper and necessary action.

(c)     This Agreement constitutes the valid and legally binding obligation of each Obligor enforceable in accordance with its terms and does not violate, conflict with, or constitute any default under any law, government regulation, organizational documents, or any other agreement or instrument binding upon or applicable to the Obligors.

(d)     No approval, authorization or other action by, or filing with, any governmental official, board or authority is required in connection with the execution and delivery of this Agreement, except such approvals and authorizations as have been received, such actions as have been taken, and such filings as have been made.

Forbearance Agreement - Page 15



(e)    Each Obligor is not now and, after giving effect to the transactions contemplated hereby, at all times will not be, insolvent, as such term is defined in the United States Bankruptcy Code, 11 U.S.C. § 101, et seq.

(f)    The Loans are and continue to be secured by the Loan Documents, and the Obligors have heretofore and does hereby waive any right for a marshaling of the Collateral now or hereafter subject to the liens and security interests acknowledged by this Agreement and granted pursuant to the Loan Documents.

(g)    Except with respect to the Existing Events of Default, no Event of Default or other default has occurred and is continuing under the Loan Documents, and no event has occurred or failed to occur that, with the lapse of time, giving of notice or both, would constitute an Event of Default or other default under the foregoing documents.

(h)    Except with respect to the Existing Events of Default, all representations and warranties set forth in the Loan Documents are true, accurate, and complete as of the date hereof.

22.    Effect of Agreement; No Novation.  The Obligors acknowledge and agree that (a) this Agreement is not intended to be, and shall not be deemed or construed to be, a novation or release of the Loan Documents; (b) except as expressly provided in this Agreement, this Agreement is not intended to be, and shall not be deemed or construed to be, a modification, amendment, or waiver of the Loan Documents; and (c) neither this Agreement nor any payments made or other actions taken pursuant to this Agreement shall be deemed to cure the Existing Events of Default unless and until all sums payable pursuant to the Loan Documents (as expressly modified herein) are paid in full.

23.    Entire Agreement.  This Agreement is the entire agreement among the parties relating to the specific subject matter of this Agreement and supersedes any prior agreements, commitments and understandings between the parties.

24.    Full Knowledge.  It is acknowledged that the Obligors have read this Agreement and consulted counsel (or had the opportunity to consult with counsel) before executing this Agreement; that the Obligors have relied upon their own judgment and that of its counsel in executing same and has not relied on or been induced by any representation, statement or act by any other party referenced to herein which is not referred to in this Agreement; and that the Obligors enter into this Agreement voluntarily, with full knowledge of its significance.

25.    Construction.  Each party acknowledges that it has participated in the negotiation of this Agreement and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured, dictated or drafted such provision.  All terms of this Agreement were negotiated at arms-length, and this Agreement was prepared and executed without fraud, duress, undue influence or coercion of any kind exerted by any of the parties upon the other.  The execution and delivery of this Agreement is the free and voluntary act of the parties.

26.    Invalid Provision to Affect No Others.  If, from any circumstances whatsoever, fulfillment of any provision of this Agreement shall involve transcending the limit of validity

42421661 v8



presently prescribed by any applicable law, with regard to obligations of like character and amount, then ipso facto the obligation to be fulfilled shall be reduced to the limit of such validity. Further, if any cause or provision herein contained operates or would prospectively operate to invalidate this Agreement, in whole or in part, then such clause or provision only shall be held for naught, as though not herein contained, and the remainder of this Agreement shall remain operative and in full force and effect.

27.     Counterparts; Electronic Delivery.  To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties thereto.  Any signature to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.  Delivery of an executed counterpart of this Agreement by telecopier or any other form of electronic transmission shall be equally as effective as delivery of an original executed counterpart thereof.  Any party delivering an executed counterpart of this Agreement by telecopier or other electronic means also shall deliver an original executed counterpart of such instrument, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect thereof.

28.     Modifications; Successors and Assigns.  This Agreement cannot be changed or terminated orally, is for the benefit of the parties hereto and their respective successors and assigns, and is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns in accordance with its terms.

29.     LIBOR Rate.  With respect to any interest rate based upon LIBOR, as of the Effective Date, the terms of Exhibit "D" are hereby incorporated by reference as if set forth herein.

30.     Time is of the Essence.  Time is of the essence in the performance of this Agreement.

31.     Governing Law; Venue.  This Agreement and all of the Loan Documents shall be construed and enforced in accordance with the laws of the State of Georgia (without regard to the conflict of laws rules in effect from time to time in the State of Georgia).  The Loan Documents are due and payable to Lender by the Obligors at Lender's principal place of business at 3344 Peachtree Road, Suite 1000, Atlanta, Fulton County, Georgia, 30326 and this Agreement and all the Loan Documents may be enforced in the state and federal courts presiding in Fulton County, Georgia.

32.     Cross-Collateralization, Cross-Default, and Cross-Guaranty. The Obligors hereby acknowledge and agree that the Obligations, including without limitation, the Revolving Loan and the Term Loans are cross-defaulted, cross-guaranteed, and cross-collateralized and the Obligors hereby reaffirms and agrees that the Loan Documents and the Collateral shall secure all

42421661 v8

of the Obligations, on a *pari passu* basis, including without limitation, (a) the obligation to pay the principal and accrued interest due and payable under that Obligations and this Agreement, (b) the obligation to pay all other indebtedness and agree charges due and payable under the Obligations and this Agreement, and (c) the obligation to perform all terms and conditions of the Obligations and this Agreement.

33.     Turnover of Assets.    In the event a Forbearance Termination Event has occurred and is continuing, Borrowers shall assist the Lender in the orderly liquidation of the Collateral pledged by the Security Agreements, including the foreclosure and sale of the Collateral (the "**Turnover of Assets**").  In implementing the Turnover of Assets, Borrowers agrees as follows:

a.  Borrowers will cooperate with Lender in the consensual and orderly liquidation of the Collateral.

b.  Borrowers acknowledge that they have received commercially reasonable, timely, and accurate notice of Lender's intention to take possession of and dispose of the Collateral, and Borrowers agree that such notice satisfies all requirements of notice under the Security Agreements, the UCC and otherwise, including, but not limited to notice required to be given by a secured party under § 9-504 of the UCC.  Notwithstanding the foregoing, in the event a Forbearance Termination Event has occurred and is continuing, Borrowers waive all rights to notice they may have been entitled to receive in the past or may be entitled to receive at any time in the future in connection with Lender's possession, sale, liquidation, collection and disposition of the Collateral; provided, however, that Borrowers do not waive any notices which may be required to be delivered to other creditors of the Borrowers pursuant to applicable law.

c.  Upon Lender's demand, Borrowers shall put Lender in sole and exclusive possession and control of all the Collateral.  Thereafter, Borrowers shall have no right to use, possess, sell, transfer, move, collect, or otherwise deal with the Collateral in any manner whatsoever other than as specifically authorized by Lender, and Borrowers warrant that they will not move, use, sell, collect, or otherwise dispose of the Collateral.  Borrowers agree that, pending the sale or other disposition of the Collateral as contemplated herein, Lender and its designees are authorized and empowered to possess, move, use, operate, collect, or otherwise deal with the Collateral as Lender or its designees deem necessary or appropriate to protect, maintain, and/or enhance the value and utility of the Collateral and to prepare the Collateral for sale.

d.  Borrowers agree to fully cooperate and assist Lender in good faith in Lender's efforts to liquidate the Collateral and in furtherance thereof, Borrowers hereby grant, bargain and sell unto Lender a temporary license over and upon all lands, real estate, buildings, and properties of Borrowers, wherever situated (hereinafter, the "**Additional Properties**") for the purposes of ingress, egress, loading, transporting, removing, and selling the Collateral and carrying out the transactions contemplated by this Agreement.  The license herein above granted shall inure to the benefit of Lender, its agents, employees, representatives, and contractors, and

42421661 v8

all purchasers and prospective purchasers of the Collateral. The foregoing licenses will terminate upon the liquidation of all the Collateral or twelve months after the Forbearance Termination Event, whichever occurs first.

e.  Without further notice to the Borrowers, Lender is authorized to sell and otherwise dispose or liquidate the Collateral in a commercially reasonable manner and in accordance with applicable law. Borrowers waive any right they might have to require the sale of the Collateral (or any portion thereof) in separate lots.

f.  To the extent Lender is secured thereby and has not subordinated its interest to a third party, Lender is authorized to notify all persons who are obligated on any of Borrowers' accounts (the "**Accounts**") to make payment thereof directly to Lender and to take control of all proceeds of any Accounts. Borrowers agree to join in any notice that Lender sends to such persons to further evidence Lender's authorization to collect the Accounts. Lender is authorized to sign and endorse Borrowers' name upon any check, draft, money order, or other form of payment of any Account item and to sign and endorse satisfactions and releases of Account items in Borrowers' names. To the extent any Accounts are evidenced by promissory notes, trade acceptances, chattel paper, chattel mortgages, conditional sales contracts, or other instruments, the Borrowers will immediately deliver same to Lender, endorsed or assigned with recourse to Lender's order and, regardless of the form of such endorsement or assignment, Borrowers hereby waive presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto. Lender is further authorized to modify, compromise, and forbear any of the Accounts and to release or otherwise deal with any collateral securing the Accounts in its discretion without prior notice to or consent of the Borrowers, and Lender is authorized to sign Borrowers' name upon any certificates of title or other documents pertaining to such collateral to effect the foregoing provisions. To the extent that they are within the possession or control of Borrowers, Borrowers shall immediately deliver to Lender copies of Borrowers' books of accounts, computer printouts, computer software programs, trial balance records, ledgers and cabinets in which they are located, reflected or maintained, in any way relating to the Collateral, and copies of all supporting evidence and documents relating thereto in the form of written applications, credit information, account cards, payment records, trial balances, correspondence, delivery receipts, certificates and the like, as well as the past and current information stored in computer software programs for and on Borrowers' behalf by third parties. Lender shall take immediate custody and control of, and collect all proceeds received by the Borrowers.

g.  The proceeds received by Lender from the sale, collection or other disposition of the Collateral shall be applied by Lender to the principal, interest, cost of sale, cost of preparation for sale, and expenses of collecting the Obligations and disposing of the Collateral, including attorney's fees, the manner, order and extent of such application to be in the sole discretion of Lender.

34.     **BANKRUPTCY.**

(a)        In entering into this Agreement, the Obligors hereby stipulate, acknowledge and agree that the Lender gave up valuable rights and agreed to forbear from exercising legal remedies available to it in exchange for the promises, representations, acknowledgements and warranties of the Obligors as contained herein and that the Lender would not have entered into this Agreement but for such promises, representations, acknowledgements, agreements, and warranties, all of which have been accepted by the Lender in good faith, the breach of which by the Obligors in any way, at any time, now or in the future, would admittedly and confessedly constitute cause for dismissal of any such bankruptcy petition pursuant to 11 U.S.C. § 1112(b).  Further, the Obligors expressly and freely admit that the filing of any bankruptcy proceeding by the Obligors would be for the sole purpose of delaying the Lender from exercising its lawful remedies, including foreclosure, and will constitute a bad faith filing subject to dismissal under 11 U.S.C. § 1112(b).

(b)        As additional consideration for the Lender agreeing to forbear from immediately enforcing its rights and remedies under the Loan Documents, including but not limited to the institution of foreclosing proceedings, the Obligors agree that in the event a bankruptcy petition under any Chapter of the Bankruptcy Code (11 U.S.C. § 101, et seq.) is filed by or against the Obligors at any time after the execution of this Agreement, the Lender shall be entitled to the immediate entry of an order from the appropriate bankruptcy court granting the Lender complete relief from the automatic stay imposed by Section 362 of the Bankruptcy Code (11 U.S.C. § 362) to exercise its foreclosure and other rights, including but not limited to obtaining a foreclosure judgment and foreclosure sale, upon the filing with the appropriate court of a motion for relief from the automatic stay with a copy of this Agreement attached thereto.  The Obligors specifically agree (i) that upon filing a motion for relief from the automatic stay, the Lender shall be entitled to relief from the stay without the necessity of an evidentiary hearing and without the necessity or requirement of the Lender to establish or prove the value of the Collateral, the lack of adequate protection of its interest in the Collateral, or lack of equity in the Collateral; (ii) that the lifting of the automatic stay hereunder by the appropriate bankruptcy court shall be deemed to be "for cause" pursuant to Section 362(d)(1) of the Bankruptcy Code (11 U.S.C. § 362(d)(1)); (iii) that the Obligors will not directly or indirectly oppose or otherwise defend against the Lender's efforts to gain relief from the automatic stay; (iv) Borrowers have few unsecured creditors; (v) it is highly unlikely that a bankruptcy filing by any Obligor will provide any significant or meaningful benefit to any of the Obligors' unsecured creditors; (vi) if they are unable to comply with, or otherwise default under, this Agreement, they will not have any realistic prospect of an effective reorganization of its business under Chapter 11 of the Bankruptcy Code (11 U.S.C. §1101 *et seq*), including the sale of its business, the sale of all or substantially all of its assets, the restructuring of its assets and liabilities or a liquidation; (vii) but for the execution of the Forbearance Agreement, no legal or equitable grounds exist that would bar, delay or impeded Lender's immediate exercise of its rights and remedies under the Loan Documents, including the right to foreclose; and (viii) that the above-referenced advance relief from the automatic stay shall in effect until June 30, 2020.  This provision is not intended to preclude the Obligors from filing for protection under any Chapter of the Bankruptcy Code.  The

42421661 v8

remedies prescribed in this paragraph are not exclusive and shall not limit the Lender's rights under the Loan Documents, this Agreement or under any law.

(c)    All of the above terms and conditions set forth in Section 34 have been freely bargained for and are all supported by reasonable and adequate consideration and the provisions herein are material inducements for the Lender entering into this Agreement.

35.    **WAIVER OF JURY TRIAL**.    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE OBLIGORS AND LENDER HEREBY EXPRESSLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LAWSUIT OR OTHER COURT ACTION RELATED TO THIS AGREEMENT, THE LOANS, THE LOAN DOCUMENTS, THE COLLATERAL, THE EXISTING EVENTS OF DEFAULT, OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY, INCLUDING, WITHOUT LIMITATION, IN RESPECT TO ANY CLAIM, COUNTERCLAIM, THIRD-PARTY CLAIM, DEFENSE, OR SET-OFF ASSERTED IN ANY SUCH LAWSUIT OR COURT ACTION.  ANY SUCH LAWSUIT OR COURT ACTION SHALL BE TRIED EXCLUSIVELY TO A COURT WITHOUT A JURY.  THE OBLIGORS SPECIFICALLY ACKNOWLEDGE THAT ITS EXECUTION OF THIS WAIVER OF JURY TRIAL IS A MATERIAL PORTION OF THE CONSIDERATION RECEIVED BY LENDER IN EXCHANGE FOR ITS ENTERING INTO THIS AGREEMENT.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement under seal with the intention that this Agreement shall be effective as of the date first above written.

<u>**BORROWERS**</u>:

**RECLEIM, LLC**, a Delaware limited liability company

By: _____

Name: _____

Title: _____

(SEAL)

Signed, sealed and delivered
this _____ day of _____ 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires: _____

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

42421661 v8

**RECLEIM NOVA, LLC**, a Delaware limited liability company

By: _____
Name: ___J. Steve Bush___
Title: ___CEO___

                                        (SEAL)

Signed, sealed and delivered
this 30th day of December, 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires:_____

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

**RECLEIM LOGISTICS, LLC**, a Delaware limited
liability company

By: _____

Name: _____

Title: _____

(SEAL)

Signed, sealed and delivered
this _____ day of _____ 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires: _____

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

**RECLEIM OH, LLC,** a Delaware limited liability company

By: _____
Name: _____
Title: _____

(SEAL)

Signed, sealed and delivered
this 30th day of December, 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires: _____

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

Forbearance Agreement - Page 25

42421661 v8

**RECLEIM PA, LLC,** a Delaware limited liability company

By: _____

Name: _____

Title: _____

(SEAL)

Signed, sealed and delivered
this _____ day of _____, 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires: _____

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

**RECLEIM SC**, **LLC,** a Delaware limited liability company

By: _____

Name: _____

Title: _____

(SEAL)

Signed, sealed and delivered
this _____ day of _____, 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires: _____

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

42421661 v8

Forbearance Agreement - Page 27

**GUARANTOR:**

**PEACHTREE INVESTMENT SOLUTIONS, LLC,** a Georgia limited liability company

By: _____
Name: _____
Title: _____

(SEAL)

Signed, sealed and delivered
this _____ day of _____, 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires:

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

Forbearance Agreement - Page 28

42421661 v8

**GUARANTOR:**

**JOHN STEPHEN BUSH**, a Georgia resident

By: _____
Name: _____
Title: _____

(SEAL)

Signed, sealed and delivered
this _____ day of _____ 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires: _____

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

42421661 v8

**GUARANTOR:**

**DWAYNE PETERSON DAVIS**, a Georgia resident

By: _____

Name: _____

Title: _____

(SEAL)

Signed, sealed and delivered
this _____ day of _____, 2019
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My commission expires:_____

[NOTARIAL SEAL]

[EXECUTIONS CONTINUED ON NEXT PAGE]

**LENDER:**

**FIFTH THIRD BANK**, **NATIONAL ASSOCIATION**
**(formerly known as Fifth Third Bank)**, a national
banking association

By: _Cynthia Clark_
Name: _Cynthia Clark_
Title: _Vice President_

(SEAL)

[END OF EXECUTIONS]

42421661 v8

## EXHIBIT "A"

## DEPOSIT ACCOUNT CONTROL AGREEMENTS

## [See Attached Pages]

## EXHIBIT "B"

## ROLLING STOCK AND VEHICLE LIST

### [See Attached Pages]

Forbearance Agreement - Page 33

**EXHIBIT "C"**

**MONTHLY FINANCIAL STATEMENTS**

**[See Attached Pages]**

42421661 v8



## EXHIBIT "D"

## LIBOR RATE

1.    **Temporary Inability**:  In the event, prior to commencement of any interest period relating to a LIBOR Loan, Lender shall determine that: deposits in Dollars (in the applicable amounts) are not being offered to it in the London Interbank Offered Rate Market for such interest period, (ii) by reason of circumstances affecting the London Interbank Offered Rate Market adequate and reasonable methods do not exist for ascertaining LIBOR, (iii) LIBOR as determined by Lender will not adequately and fairly reflect the cost to Lender of funding its LIBOR Loans for such interest period or (iv) the making or funding of LIBOR Loans become impracticable; *then*, Lender shall promptly provide notice of such determination to Debtor (which shall be conclusive and binding on Obligors), and (x) any request for a LIBOR Loan or for a conversion to or continuation of a LIBOR Loan shall be automatically withdrawn and shall be deemed a request for a Base Rate Loan, (y) each LIBOR Loan will automatically, on the last day of the then current interest period relating thereto, become a Base Rate Loan, and (z) the obligations of Lender to make LIBOR Loans shall be suspended until Lender determines that the circumstances giving rise to such suspension no longer exist, in which event Lender shall so notify Debtor.

2.    **Permanent Inability**:

(a)    In the event, Lender shall determine (which determination shall be deemed presumptively correct absent manifest error) that:

(i)    the circumstances set forth in Paragraph 1 ("Temporary Inability") above have arisen and such circumstances are unlikely to be temporary; or

(ii)    a public statement or publication of information (1) by or on behalf of the administrator of LIBOR; or by the regulatory supervisor for the administrator of LIBOR, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for LIBOR, a resolution authority with jurisdiction over the administrator for LIBOR or a court or an entity with similar insolvency or resolution authority over the administrator for LIBOR; in each case which states that such administrator has ceased or will cease to provide LIBOR, permanently or indefinitely, *provided that*, at the time of the statement or publication, there is no successor administrator that will continue to provide LIBOR, (2) by the administrator of LIBOR that it has invoked or will invoke, permanently or indefinitely, its insufficient submissions policy, or (3) by the regulatory supervisor for the administrator of LIBOR or any governmental authority having jurisdiction over the Lender announcing that LIBOR is no longer representative or may no longer be used; or

(iii)    a LIBOR rate is not published by the administrator of LIBOR for five (5) consecutive Business Days and such failure is not the result of a temporary moratorium, embargo or disruption declared by the administrator of LIBOR or by the regulatory supervisor for the administrator of LIBOR; or

42421661 v8

(iv)    a new index rate has become a widely-recognized replacement benchmark rate for LIBOR in newly originated loans denominated in Dollars in the U.S. market;

then Lender may, in its sole discretion, amend the Loan Documents as described below to replace LIBOR with an alternative benchmark rate ("Replacement Index"), and to modify the applicable margins and make other related amendments, in each case giving due consideration to any evolving or then existing convention for similar US dollar denominated credit facilities, or any selection, endorsement or recommendation by a relevant governmental body with respect to such facilities.

(b)    Lender shall provide notice to Debtor of an amendment of the Loan Documents to reflect the Replacement Index, adjusted margins and such other related amendments as may be appropriate, in the sole discretion of the Lender, for the implementation and administration of the Replacement Index-based rate. Notwithstanding anything to the contrary in this Amendment or the other Loan Documents (including, without limitation, Paragraph 20 above) such amendment shall become effective without any further action or consent of any other party to this Amendment upon delivery of notice to Debtor.

(c)    For the avoidance of doubt, following the date when a determination is made pursuant to Paragraph (2)(a) above, and until a Replacement Index has been selected and implemented in accordance with the terms and conditions of Paragraphs (2)(a) and (2)(b), at Lender's election, all outstanding Indebtedness shall accrue interest at, and the LIBOR interest rate shall be, the Base Rate (as defined below).

3.    Notwithstanding anything to the contrary contained herein, if at any time the replacement index is less than zero, then at such times, such index shall be deemed to be zero for purposes of the Loan Documents.

"Base Rate" means, for any day, a floating interest rate per annum equal to the highest of (a) the rate of interest from time to time announced by Lender at its principal office as its prime commercial lending rate (it being understood that such prime commercial rate is a reference rate and does not necessarily represent the lowest or best rate being charged by the Lender to any customer and such rate is set by the Lender based upon various factors including the Lender's costs and desired return, general economic conditions and other factors), plus zero percent (0.00%) per annum, and (b) the sum of one half of one percent (0.50%) per annum and the Federal Funds Rate. Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the Lender's prime commercial lending rate or the Federal Funds Rate.

"Base Rate Loan" means any portion of the Indebtedness bearing interest at a rate based upon the Base Rate.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum (based on a 360 day year) equal, for each day of such period, to the average of the rates of interest charged on overnight federal funds transactions with member banks of the Federal Reserve System only,

42421661 v8

as published for any day which is a Business Day by the Federal Reserve Bank of New York (or, in the absence of such publication, as reasonably determined by Lender).